1

2

3

4

5

6

7

8        **UNITED STATES DISTRICT COURT**

9        **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   ECHOLOGICS, LLC, et al.,                          Case No.:  21-cv-01147-RBM-AHG

12                                    Plaintiff,
                                                        **TENTATIVE CLAIM**
13   v.                                                 **CONSTRUCTION ORDER**

14   ORBIS INTELLIGENT SYSTEMS,
     INC.,
15
                                    Defendants.
16

17

18        In the present action, Plaintiffs Echologics, LLC, Mueller International, LLC

19   ("Mueller International"), and Mueller Canada, Ltd. d/b/a Echologics ("Mueller Canada")

20   (collectively, "Plaintiffs" or "Echologics") assert a claim of patent infringement against

21   Defendant Orbis Intelligent Systems, Inc. ("Orbis"), alleging infringement of U.S. Patent

22   No. 10,881,888 (filed Nov. 18, 2017) (issued Jan. 5, 2021) ("the '888 Patent").  (Doc. 1.)

23   On March 29, 2022, the parties filed their joint claim construction hearing statement, chart,

24   and worksheet pursuant to Patent Local Rule 4.2, identifying the disputed claim terms from

25   the '888 Patent.  (Doc. 35.)  On May 10, 2022, the parties each filed their opening claim

26   construction briefs.  (Docs. 43, 46.)  On May 24, 2022, the parties each filed their

27   responsive claim construction briefs.  (Docs. 48, 49.)

28        A claim construction hearing is scheduled for June 21, 2022 at 11:00 a.m.   In

1

1   anticipation of the hearing, the Court issues the following tentative claim construction

2   order.

### I.   BACKGROUND

4   "Plaintiffs are indirect subsidiaries of Mueller Water Products, Inc. ('MWP'), a

5   public company with subsidiaries that are leading manufacturers of products and services

6   used in the transmission, distribution, and measurement of water." (Doc. 1, Compl. ¶ 10.)

7   Echologics provides technologies, products, and services that can non-invasively detect

8   underground leaks and assess the condition of water mains. (*Id*. ¶ 11.)  Defendant Orbis is

9   a company that has developed sensors that can be used to detect leaks in water pipes and

10   defects in pipe walls. (Doc. 46 at 3.)

11   Mueller International is the owner of the '888 Patent. (Doc. 1, Compl. ¶ 14.)  *See*

12   *also* '888 Patent, at [73].  In the present action, Echologics alleges that Orbis' design,

13   manufacture, testing, use, importation, sale, and/or offering for sale in the United States of

14   Orbis' nozzle cap products, specifically its Prodigy SmartCap product, directly infringe at

15   least claims 1, 2, 3, 5, and 7 of the '888 Patent. (*Id*. ¶¶ 22, 27, 31-38.)

16   The '888 Patent is titled "Infrastructure Monitoring Devices, Systems, and

17   Methods," and "is directed to devices, systems, and methods related to monitoring and

18   controlling an infrastructure such as, but not limited to, the supply and use of commercial,

19   industrial or residential water, gas and/or electric utilities, and, in particular, to devices,

20   methods, and systems for monitoring and controlling a municipality and alerting a user to

21   potential faults and actions required." '888 Patent at [54], col. 1:19-25.  In describing the

22   background of the invention, the '888 Patent explains that municipalities administer and/or

23   outsource numerous complex utility and safety systems, including water distribution

24   systems. *See id*. at col. 1:29-35.  "Each of these systems needs to be monitored for use

25   (authorized or unauthorized), faults, tampering, events, interruptions or blockages, leaks,

26   contamination, and/or other issues." *Id*. at col. 1:35-38.

27   The '888 Patent explains that typically, in order to obtain an understanding of the

28   state of any one system, personnel must check for problems within the system manually.

*Id.* at col. 1:39-42. "This process is slow, is labor-intensive, and can lead to overlooked problems. Furthermore, preferred aspects of the system may be evaluated irregularly or infrequently, thereby allowing a problem to go unchecked for long periods of time." *Id.* at col. 1:42-46.

The '888 Patent seeks to overcome the problems and disadvantages discussed above by providing new systems and methods for monitoring municipality infrastructure. *Id.* at col. 2:11-14. Specifically, the '888 Patent explains that in water infrastructure systems,

> monitoring devices can be located throughout the system, for example, as attachments to component parts, for feedback to a network that can provide real-time information to the utility operating the network. The network operators can use the information transmitted to activate controlling devices on the network, or to dispatch repair or other services as directed by the information provided by the network. For example, if water pressure monitors on a water meter indicate a variance between locations, a water leak can be reported using the network, and controlling devices can divert water.

*Id.* at col. 4:49-60.

Independent claim 1 of the '888 Patent, the sole independent claim in the '888 patent and the only independent claim asserted by Echologics in this action, claims:

> 1. An infrastructure monitoring assembly comprising:
>
> a fire hydrant, the fire hydrant defining a nozzle, the nozzle defining external threading at a nozzle end of the nozzle;
>
> a nozzle cap, the nozzle cap comprising a metallic material, the nozzle cap defining a first nozzle cap end and a second nozzle cap end, a threaded bore extending into the nozzle cap from the second nozzle cap end to a bore shoulder defined between the first nozzle cap end and the second nozzle cap end, the threaded bore engaging the external threading, a gasket contacting the nozzle end and the bore shoulder in sealing engagement and sealing a nozzle bore of the nozzle;
>
> an antenna cover attached to the nozzle cap, the antenna cover comprising a non-metallic material, the antenna cover defining a first antenna cover end and a second antenna cover end, the first antenna cover end defined opposite from the second antenna cover end, the second antenna cover end positioned between the first nozzle cap end and the bore shoulder of the nozzle cap, the second antenna cover end positioned between the first antenna cover end and the second nozzle cap end; and

3

1   an antenna covered by the antenna cover.

2   '888 Patent at col. 18:5-28.

3         On June 22, 2021, Echologics filed a complaint for patent infringement against

4   Orbis, alleging infringement of the '888 Patent.  (Doc. 1, Compl.)  On July 19, 2021, Orbis

5   filed an answer to Echologics' complaint and counterclaims.  (Doc. 14.)

6         On November 8, 2021, the Court issued a scheduling order.  (Doc. 30.)   On

7   November 9, 2021, the Court denied Orbis' motion to transfer venue.  (Doc. 31.)  By the

8   present claim construction briefs, the parties request that the Court construe four disputed

9   claim terms from the '888 Patent.  (*See* Docs. 43, 46, 48, 49; *see also* Doc. 35 at 1.)

10   **II.      DISCUSSION**

11   **A.      Legal Standards for Claim Construction**

12         Claim construction is an issue of law for the court to decide.  *Teva Pharms. USA,*

13   *Inc. v. Sandoz, Inc.*, 574 U.S. 318, 326 (2015); *Markman v. Westview Instruments, Inc.*,

14   517 U.S. 370, 372 (1996).  Although claim construction is ultimately a question of law,

15   "subsidiary factfinding is sometimes necessary."  *Teva*, 574 U.S. at 326.

16         "The purpose of claim construction is to 'determin[e] the meaning and scope of the

17   patent claims asserted to be infringed.'"  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech.*

18   *Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (citation omitted).  "It is a 'bedrock principle'

19   of patent law that the 'claims of a patent define the invention to which the patentee is

20   entitled the right to exclude.'"  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir.

21   2005) (en banc) (citations omitted).

22         Claim terms "'are generally given their ordinary and customary meaning[,]'" which

23   "is the meaning that the term would have to a person of ordinary skill in the art in question

24   at the time of the invention."  *Id*. at 1312–13.  "In some cases, the ordinary meaning of

25   claim language as understood by a [PHOSITA] may be readily apparent even to lay judges,

26   and claim construction in such cases involves little more than the application of the widely

27   accepted meaning of commonly understood words."  *Id*. at 1314.  "However, in many

28   cases, the meaning of a claim term as understood by persons of skill in the art is not readily

apparent." *O2 Micro*, 521 F.3d at 1360.  If the meaning of the term is not readily apparent, the court must look to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean," including intrinsic and extrinsic evidence.  *See Phillips*, 415 F.3d at 1314.  A court should begin with the intrinsic record, which consists of the language of the claims, the patent specification, and, if in evidence, the prosecution history of the asserted patent.  *Id*.; *see also Vederi, LLC v. Google, Inc.*, 744 F.3d 1376, 1382 (Fed. Cir. 2014) ("In construing claims, this court relies primarily on the claim language, the specification, and the prosecution history.").

In determining the proper construction of a claim, a court should first look to the language of the claims.  *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *see also Comark Commc'ns v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998) ("The appropriate starting point . . . is always with the language of the asserted claim itself.").  The context in which a disputed term is used in the asserted claims may provide substantial guidance as to the meaning of the term.  *See Phillips*, 415 F.3d at 1314. In addition, the context in which the disputed term is used in other claims, both asserted and unasserted, may provide guidance because "the usage of a term in one claim can often illuminate the meaning of the same term in other claims."  *Id*.  A disputed term should be construed "consistently with its appearance in other places in the same claim or in other claims of the same patent."  *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001); *accord Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008); *see also Paragon Sols., LLC v. Timex Corp.*, 566 F.3d 1075, 1087 (Fed. Cir. 2009) ("We apply a presumption that the same terms appearing in different portions of the claims should be given the same meaning." (internal quotation marks omitted)).  Moreover, "'[a] claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.'"  *Vederi*, 744 F.3d 1383.

A court must also read claims "in view of the specification, of which they are a part." *Markman*, 52 F.3d at 979; *see* 35 U.S.C. § 112(b) ("The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter

1    which the inventor or a joint inventor regards as the invention."). "'Apart from the claim

2    language itself, the specification is the single best guide to the meaning of a claim term.'"

3    *Vederi*, 744 F.3d at 1382 (quoting *AIA Eng'g Ltd. v. Magotteaux Int'l S/A*, 657 F.3d 1264,

4    1272 (Fed. Cir. 2011)).  For example, "a claim construction that excludes [a] preferred

5    embodiment [described in the specification] is rarely, if ever, correct and would require

6    highly persuasive evidentiary support." *Adams Respiratory Therapeutics, Inc. v. Perrigo*

7    *Co.*, 616 F.3d 1283, 1290 (Fed. Cir. 2010) (citation and internal quotation marks omitted).

8         But "[t]he written description part of the specification does not delimit the right to

9    exclude.  That is the function and purpose of claims." *Markman v. Westview Instruments,*

10   *Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc).  Therefore, "it is improper to read

11   limitations from a preferred embodiment described in the specification—even if it is the

12   only embodiment—into the claims absent a clear indication in the intrinsic record that the

13   patentee intended the claims to be so limited." *Dealertrack, Inc. v. Huber*, 674 F.3d 1315,

14   1327 (Fed. Cir. 2012); *see also Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348

15   (Fed. Cir. 2009) ("The patentee is entitled to the full scope of his claims, and we will not

16   limit him to his preferred embodiment or import a limitation from the specification into the

17   claims.").

18        In addition to the claim language and the specification, the patent's prosecution

19   history may be considered if it is in evidence. *Phillips*, 415 F.3d at 1317.  The prosecution

20   history "consists of the complete record of the proceedings before the [Patent and

21   Trademark Office ("PTO")] and includes the prior art cited during the examination of the

22   patent." *Id*.  "Like the specification, the prosecution history provides evidence of how the

23   PTO and the inventor understood the patent." *Id*.  "Yet because the prosecution history

24   represents an ongoing negotiation between the PTO and the applicant, rather than the final

25   product of that negotiation, it often lacks the clarity of the specification and thus is less

26   useful for claim construction purposes." *Id*.

27        In most situations, analysis of the intrinsic evidence will resolve claim construction

28   disputes. *See Vitronics*, 90 F.3d at 1583; *Teva*, 574 U.S. at 331.  However, "[w]here the

1  intrinsic record is ambiguous, and when necessary," district courts may "rely on extrinsic

2  evidence, which 'consists of all evidence external to the patent and prosecution history,

3  including expert and inventor testimony, dictionaries, and learned treatises.'"  *Power*

4  *Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1360 (Fed. Cir.

5  2013) (quoting *Phillips*, 415 F.3d at 1317).  A court must evaluate all extrinsic evidence in

6  light of the intrinsic evidence.  *Phillips*, 415 F.3d at 1319.  "Extrinsic evidence may not be

7  used 'to contradict claim meaning that is unambiguous in light of the intrinsic evidence.'"

8  *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1290 (Fed. Cir. 2015); *see also Bell*

9  *Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1269 (Fed. Cir.

10  2001) ("[E]xtrinsic evidence . . . may not be used to vary, contradict, expand, or limit the

11  claim language from how it is defined, even by implication, in the specification or file

12  history."); *Vederi*, 744 F.3d at 1382 ("[E]xtrinsic evidence may be less reliable than the

13  intrinsic evidence.").  In cases where subsidiary facts contained in the extrinsic evidence

14  "are in dispute, courts will need to make subsidiary factual findings about that extrinsic

15  evidence."  *Teva*, 574 U.S. at 332.

16      "[D]istrict courts are not (and should not be) required to construe every limitation

17  present in a patent's asserted claims."  *O2 Micro*, 521 F.3d at 1362.  In certain situations,

18  it is appropriate for a court to determine that a claim term needs no construction and its

19  plain and ordinary meaning applies.  *See id.*; *Phillips*, 415 F.3d at 1314.  But "[a]

20  determination that a claim term 'needs no construction' or has the 'plain and ordinary

21  meaning' may be inadequate when a term has more than one 'ordinary' meaning or when

22  reliance on a term's 'ordinary' meaning does not resolve the parties' dispute."  *O2 Micro*,

23  521 F.3d at 1361.  If the parties dispute the scope of a certain claim term, it is the court's

24  duty to resolve the dispute.  *Id*. at 1362; *accord Eon Corp. IP Holdings v. Silver Spring*

25  *Networks*, 815 F.3d 1314, 1318 (Fed. Cir. 2016).

26  **B.      Disputed Claim Terms**

27          1.      "antenna cover"

28  Plaintiff Echologics argues that the claim term "antenna cover" should be given its

7

plain and ordinary meaning and, thus, no construction is necessary.  (Doc. 43 at 7.) Echologics proposes in the alternative, if a construction is required, that the term "antenna cover be construed as "a structure that protects or conceals an antenna." (*Id*.)  Defendant Orbis proposes that the term "antenna cover" be construed as "a cover that creates an antenna cavity (i.e., hollow structure) in which the antenna is located." (Doc. 46 at 11-12.)

Here, the parties' dispute regarding this claim term is two-part.  First, Orbis contends that the claim term "antenna cover" includes the requirement that the cover create a cavity where the antenna is located.  Second, Echologics contends that the claim term "antenna cover" requires that the cover protect or conceal the antenna.  The Court addresses each of these proposed requirements in turn below.

The Court begins with Orbis' contention that the claim term "antenna cover" includes the requirement that the cover create a cavity where the antenna is located. Independent claim 1 of the '888 Patent recites:

> an antenna cover attached to the nozzle cap, the antenna cover comprising a non-metallic material, the antenna cover defining a first antenna cover end and a second antenna cover end, the first antenna cover end defined opposite from the second antenna cover end, the second antenna cover end positioned between the first nozzle cap end and the bore shoulder of the nozzle cap, the second antenna cover end positioned between the first antenna cover end and the second nozzle cap end; and
>
> an antenna covered by the antenna cover.

'888 Patent at col. 18:18-27.  Here, in describing the antenna cover, the claim language does not contain a requirement that the cover create an antenna cavity.  Rather, the claim language simply states that the antenna is "covered by the antenna cover." *Id*. at col. 18:27. Thus, the claim language does not support Orbis' proposed construction.

Turning to the specification, Orbis relies on several portions of the specification to support its proposed construction for the claim term "antenna cover."  Orbis cites to figure 6c and its corresponding description in the specification, which Orbis contends shows an antenna cover creating antenna cavity for the antenna.  (Doc. 46 at 14–15.)  But the specification makes clear that figure 6c represents only an embodiment of the invention.

8

*See* '888 Patent at col. 4:3-4 ("FIG. 6C is a sectional view of one embodiment of the nozzle cap of FIG. 6A); col. 6:16-16 ("FIGS. 6B and 6C depict cutaway views of an embodiment of the nozzle cap 600."). "'[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited.'" *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004)). Here, there is no language in the specification providing a clear indication that the invention should be limited to these embodiments. *See Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1366–67 (Fed. Cir. 2012) ("To constitute disclaimer, there must be a clear and unmistakable disclaimer.").

Orbis also relies on a passage from the '888 Patent's abstract. The abstract of the '888 Patent provides: "An infrastructure monitoring assembly includes . . . an antenna cover attached to the nozzle cap, the antenna cover comprising a plastic material, the antenna cover defining an antenna cavity; and an antenna disposed within the antenna cavity." '888 Patent at [57]. The Federal Circuit has explained that courts may "look[] to the abstract to determine the scope of the invention." *Hill–Rom Co., Inc. v. Kinetic Concepts, Inc.*, 209 F.3d 1337, 1341 n.* (Fed. Cir. 2000) (collecting cases). Nevertheless, "[w]hen consulting the specification to clarify the meaning of claim terms, courts must take care not to import limitations into the claims from the specification. [The Federal Circuit] has recognized the 'fine line between' the encouraged and the prohibited use of the specification." *Abbott Lab'ys v. Sandoz, Inc.*, 566 F.3d 1282, 1288 (Fed. Cir. 2009) (citing *Comark Commc'ns*, 156 F.3d at 1186). Here, the abstract describes an antenna cover that defines an antenna cavity, but the abstract does not use clear language explaining that the claimed invention is limited to this disclosure contained in the abstract.

Indeed, in other areas, the invention claimed in claim 1 of '888 Patent is broader than what is described in the abstract. For example, the abstract states an "antenna cover comprising a plastic material." '888 Patent at [57]. In contrast, independent claim 1 of the

9

'888 Patent states: "the antenna cover comprising a non-metallic material." *Id*. at col. 18:18-19.  Here, with respect to this element, the claim language is broader than what is disclosed in the abstract.  As such, there is no clear indication that the claim language should be limited to the language in the abstract, and the Court declines to import limitations from the abstract into the claims.  *See Thorner*, 669 F.3d at 1366–67 ("To constitute disclaimer, there must be a clear and unmistakable disclaimer.").  In sum, the specification of the '888 Patent does not support Orbis' proposed construction.[1]

To support its proposed construction, Orbis also relies on the prosecution history of the '888 Patent.  During the prosecution of the '888 Patent, the patentee filed a terminal disclaimer to U.S. Patent 10,386,257 ("the '257 Patent") and 10,305,178 ("the '178 Patent").  (Doc. 46-1, Geyer Decl., Ex. 1 at 8–11.)  Orbis argues that this terminal disclaimer supports its contention that the claim term "antenna cover" includes the requirement that the cover create a cavity where the antenna is located.  (Doc. 46 at 16–18.)  But there are several problems with Orbis' position.

First, Orbis argues that by filing terminal disclaimers to the '257 Patent and the '178 Patent, the patentees acknowledged that the related terms in those patents are patentably indistinct from the "antenna cover" of the '888 Patent.  (Doc. 46 at 18.)  This is an incorrect statement of the law.  Echologics correctly notes that a terminally disclaimed patent can "provide larger claim scope to a patentee" than the patentee had under the parent patent.

---

[1] The Court does not find persuasive Orbis' citations to *Intellectual Ventures I LLC v. Motorola Mobility LLC*, 870 F.3d 1320 (Fed. Cir. 2017), and *Bayer CropScience AG v. Dow AgroSciences LLC*, 728 F.3d 1324 (Fed. Cir. 2013).  (Doc. 49 at 2–3.)  Unlike here, the specification at issue in *Intellectual Ventures* did contain a clear disclaimer of scope as to the term at issue.  *See* 870 F.3d at 1125 (noting that the specification explained that the invention does not use intermediate storage of files on an intervening computer).  And in *Bayer*, the proposed construction at issue was contradicted by clear meaning of the word "monooxygenase."  *See* 728 F.3d at 1328 (explaining that Bayer's proposed construction stripped the claim term "of the scientifically accepted descriptive content of the term 'monooxygenase'").

1   *XY, LLC v. Trans Ova Genetics, LC*, 968 F.3d 1323, 1334 (Fed. Cir. 2020); *accord*

2   *SimpleAir, Inc. v. Google LLC*, 884 F.3d 1160, 1167 (Fed. Cir. 2018).  Thus, the filing of

3   the terminal disclaimer did not render the claims of the '888 Patent patentably indistinct

4   from the claims of the '257 Patent and the '178 Patent.  *See SimpleAir*, 884 F.3d at 1168

5   (explaining that there is no "presumption that a patent subject to a terminal disclaimer is

6   patentably indistinct from its parent patents").

7         Second, to the extent they are relevant, a review of the claim language in the '257

8   Patent and the '178 Patent shows that these patents cut against Orbis's proposed

9   construction.  For example, independent claim 1 of the '178 Patent recites:

10          an antenna cover positioned on the nozzle cap housing and secured between
            the upper rim and the lower rim, the nozzle cap housing, the antenna cover,
11          and the nozzle cap cover defining an antenna cover cavity; and

12          an antenna assembly positioned in the antenna cover cavity . . . .

13   U.S. Patent No. 10,305,178, at col. 21:40–44 (filed May 28, 2019).  Here, the patentee used

14   express claim language to explain that the nozzle cap housing, antenna cover, and nozzle

15   cap cover define an antenna cover cavity.  If as Orbis proposes, the claim term "antenna

16   cover" implicitly includes the requirement that the cover form a cavity for the antenna, (*see*

17   Doc. 49 at 8), then there would be no need to expressly state that these components form

18   an antenna cover cavity.  This shows that when the patentee wanted the claims to

19   specifically include a cavity for the antenna as part of the antenna cover, the patentee knew

20   the express language to do so.  The patentee did not do so in independent claim 1 of the

21   '888 Patent.[2]   As such, the prosecution history does not support Orbis' proposed

22   construction.

23

24   _____

25

26   [2] Similarly, dependent claim 6 of the '257 Patent recites: "the antenna enclosure defines an
     antenna cavity, and wherein the antenna is disposed within the antenna cavity."  U.S. Patent

27   No. 10,386,257, at col. 30:34-36 (filed Aug. 20, 2019).  Here, the patentee used express
     claim language to explain that the claimed antenna enclosure included a cavity containing

28   the antenna.  There is no express language in claim 1 of the '888 Patent describing a cavity.

Turning to Echologics' proposal, Echologics' proposed construction seeks to give the word "covered" its common meaning.  Independent claim 1 recites "an antenna covered by the antenna cover." '888 Patent at col. 18:28.  The common meaning of the verb "cover" is "put something on top of or in front of (something) in order to protect or conceal it." (Doc. 43-2, Ex. 2.)  *See also* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 524 (1981) (defining the verb "cover" as "1a: to guard from attack : protect . . . 2a(1) to hide from sight or knowledge").  Thus, the claim language and extrinsic evidence support Echologics' proposed construction.[3]

In sum, the Court adopts Echologics' proposed construction for this claim term, and the Court rejects Orbis' proposed construction.  The Court tentatively construes the term "antenna cover" as "a structure that protects or conceals an antenna."

      2.    "bore shoulder"

Plaintiff Echologics argues that the claim term "bore shoulder" should be given its plain and ordinary meaning and, thus, no construction is necessary.  (Doc. 43 at 7.) Defendant Orbis proposes that the term "bore shoulder" be construed as "portion of the bore where a change in diameter occurs forming an abutment for the gasket." (Doc. 46 at 18.)

The Court begins its analysis of this claim term by noting that the parties do not appear to dispute the proper scope of the claim term "bore shoulder."  For example, the parties agree as to what constitutes the "bore shoulder" with respect to the embodiments of

---

[3] Orbis argues that it is improper to import limitations into the claims that are not present in the intrinsic record.  (Doc. 46 at 16.)  But that is not what the Court has done here.  The claim language, which is part of the intrinsic record, states that the antenna is "covered" by the antenna cover.  The Court is simply giving the word "covered," which is in the claim language, its common meaning. *See Phillips*, 416 F.3d at 1314 (explaining that sometimes claim construction "involves little more than the application of the widely accepted meaning of commonly understood words").

1    the invention depicted in figures 6b and 6c of the '888 Patent.[4]

2         Echologics identifies the "bore shoulder" in figure 6b as follows:



'888 Patent, Figure 6b (annotated)

(Doc. 43 at 9.)

         Orbis identifies the "bore shoulder" in figure 6c as follows (highlighted in green):



(Doc. 46 at 18.)

_____

[4] Indeed, in its response brief, Orbis contends that there no longer seems to be a dispute between the parties regarding the scope of the term "bore shoulder."  (Doc. 49 at 8.)

13

1   Nevertheless, the parties dispute whether this term should be further construed for
2   the jury.  Orbis argues that the Court should construe the term "bore shoulder" because the
3   actual structure of the bore shoulder may not be readily apparent to the jurors.  (Doc. 46 at
4   18–19.)  Echologics argues that no construction for this claim term is necessary because
5   the claim language itself provides sufficient context to the jury as to the meaning of this
6   claim term.  (Doc. 43 at 9–10.)  The Court agrees with Echologics.

7   The Court begin its analysis of the parties' dispute regarding "bore shoulder" by
8   reviewing the claim language.  Independent claim 1 recites:

9       a nozzle cap, the nozzle cap comprising a metallic material, the nozzle cap
10      defining a first nozzle cap end and a second nozzle cap end, a threaded bore
        extending into the nozzle cap from the second nozzle cap end to a bore
11      shoulder defined between the first nozzle cap end and the second nozzle cap
        end, the threaded bore engaging the external threading, a gasket contacting
12      the nozzle end and the bore shoulder in sealing engagement and sealing a
13      nozzle bore of the nozzle . . . .

14  '888 Patent at col. 18:9-17.  Here, the claim language explains that the bore shoulder is part
15  of the nozzle cap located between the first nozzle cap end and the second nozzle cap end,
16  and the threaded bore extends into the nozzle cap through to the bore shoulder.  The claim
17  language further explains that a gasket contacts the bore shoulder and the nozzle end in a
18  sealing engagement.  Thus, the claim language itself provides a sufficient and detailed
19  explanation of the term "bore shoulder."

20  Turning to the specification of the '888 Patent, the specification provides no aid in
21  resolving the parties' dispute regarding this claim term as the term "bore shoulder" is found
22  nowhere in the specification.  Turning to the prosecution history, Orbis argues that the
23  prosecution history of the '888 Patent supports its proposed construction.  (Doc. 46 at 19.)
24  To support this contention, Orbis relies on statements made by the examiner regarding a
25  piece of prior art, U.S. Patent Publication No. 2003/0107485 ("Zoratti").  (*Id.*)  The Court
26  does not find Orbis' reliance on these statements persuasive.  The Federal Circuit has
27  cautioned that claim construction should not be decided based on "isolated statements"
28  from an examiner.  *3M Innovative Properties Co. v. Tredegar Corp.*, 725 F.3d 1315, 1332

1  (Fed. Cir. 2013); *see also Phillips*, 415 F.3d at 1317 ("[B]ecause the prosecution history

2  represents an ongoing negotiation between the PTO and the applicant, rather than the final

3  product of that negotiation, it often lacks the clarity of the specification and thus is less

4  useful for claim construction purposes."). Further, the statements at issue do not support

5  Orbis' proposed construction for this claim. In the cited statements, the examiner describes

6  the bore shoulder of the Zoratti reference as the interior surface of the nozzle cap that

7  extends perpendicularly to the threaded bore at the end of the threaded bore. (Doc. 46-2,

8  Geyser Decl. Ex. 1 at 58.) The examiner does not refer to a change in diameter or forming

9  an abutment for the gasket. (*See id*.)

10  Finally, to support its proposed construction for the term "bore shoulder," Orbis also

11  relies on extrinsic evidence, specifically three technical dictionaries. (Doc. 46 at 20.) But

12  these three dictionaries do not provide a consistent definition for the term "shoulder." (*See*

13  Doc. 46-1, Geyser Decl. Exs. 3–5.) Indeed, only one of the three definitions cited actually

14  supports Orbis' full proposed construction for this claim term. As such, the Court does not

15  find Orbis' reliance on these dictionary definitions persuasive.

16  In sum, the Court rejects Orbis' proposed construction for the term "bore shoulder."

17  The claim language itself provides a sufficient description of the term "bore shoulder," and,

18  therefore, the Court tentatively declines to construe this claim term.

19  3.    "first nozzle cap end"

20  Plaintiff Echologics argues that the claim term "first nozzle cap end" should be given

21  its plain and ordinary meaning and, thus, no construction is necessary. (Doc. 43 at 7.)

22  Defendant Orbis proposes that the claim term "first nozzle cap end" be construed as "end

23  of the assembled nozzle cap farthest from the fire hydrant." (Doc. 46 at 21.)

24  In their briefing, the parties explain that they agree regarding most of Orbis'

25  proposed construction for this claim term. (Doc. 46 at 21; Doc. 48 at 9 & n.6.) The parties

26  appear to agree that the "first nozzle cap end" is the end of the assembled nozzle cap

27  farthest from the fire hydrant. (*See id*.)

28  This portion of Orbis' proposed construction is supported by the claim language of

1    the '888 Patent.  Independent claim 1 of the '888 Patent claims a "a fire hydrant, the fire

2    hydrant defining a nozzle, the nozzle defining external threading at a nozzle end of the

3    nozzle."  '888 Patent at col. 18:6-8.  Claim 1 further claims "a nozzle cap:"

> the nozzle cap defining a first nozzle cap end and a second nozzle cap end, a
> threaded bore extending into the nozzle cap from the second nozzle cap end
> to a bore shoulder defined between the first nozzle cap end and the second
> nozzle cap end, the threaded bore engaging the external threading . . . .

7    *Id.* at col. 18:9-15.  Here, the claim language explains that the nozzle cap has two ends, a

8    first end and a second end.  And the second end has a threaded bore extending from it, and

9    this threaded bore engages the external threading of the fire hydrant.  Thus, the second

10   nozzle cap end is the end closest to the fire hydrant, which means that the first nozzle cap

11   end, which is on the opposite end of the cap, is on the end furthest away from the fire

12   hydrant.  As such, the Court will include in its construction for this claim term that the

13   "first nozzle cap end" is the end of the nozzle cap farthest from the fire hydrant.

14        Turning to the remainder of Orbis' proposed construction, the parties dispute Orbis'

15   inclusion of the word "assembled" as part of its proposed construction for this claim term.[5]

16   (Doc. 48 at 9.)   Orbis provides no support in the intrinsic record for its proposed

17   requirement that the nozzle cap be "assembled."  To the contrary, Orbis itself states that

18   that an embodiment of the invention described in the '888 Patent "has the nozzle cap made

19   of a single piece of material."  (Doc. 46 at 21 (citing '888 Patent at fig. 6c).)   Thus,

20   according to Orbis, the '888 Patent includes an embodiment where the nozzle cap is not

21   assembled, rather it is made of a single piece of material.  "A claim construction that

22   excludes a preferred embodiment is 'rarely, if ever, correct.'"  *Kaneka Corp. v. Xiamen*

23   *Kingdomway Grp. Co.*, 790 F.3d 1298, 1304 (Fed. Cir. 2015) (quoting *MBO Lab'ys, Inc.*

---

[5] Orbis argues that Echologics waived its right to challenge the inclusion of the word "assembled" in Orbis' proposed construction for this term because Echologics did not address this issue in its opening claim construction brief. (Doc. 49 at 10.) The Court rejects this argument.  Echologics addressed this issue in its responsive claim construction brief. (Doc. 48 at 9.)  Thus, the argument was not waived.

21-cv-01147-RBM-AHG

1  *v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007)).  As such, the Court

2  declines to include a requirement that the nozzle cap be "assembled" in its construction for

3  this claim term.

4       In its briefing, Orbis argues that its proposed construction would be helpful to a jury

5  because it clarifies to the jury that the nozzle cap may be made of a single piece or multiple

6  pieces.  (Doc. 46 at 21–22.)   The Court disagrees.   Orbis' proposed construction as

7  currently written would suggest to the jury that the nozzle cap must be "assembled" from

8  component parts.  *Cf.* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 131 (1981)

9  (defining "assemble" as "to fit together various parts of so as to make into an operative

10  whole").   Such a construction would be incorrect, as it would exclude a preferred

11  embodiment as noted above.  In sum, the Court tentatively construes the term "first nozzle

12  cap end" as "end of the nozzle cap farthest from the fire hydrant."

13       4.    "the enclosure is disposed within the nozzle cap"

14       Plaintiff Echologics argues that the claim term "the enclosure is disposed within the

15  nozzle cap" should be given its plain and ordinary meaning and, thus, no construction is

16  necessary.  (Doc. 43 at 7.)  Defendant Orbis proposes that the claim term "the enclosure is

17  disposed within the nozzle cap" be construed as "the enclosure is a separate structure within

18  the nozzle cap."  (Doc. 46 at 23.)

19       Here, Orbis contends that the claimed "enclosure" must be a separate physical

20  structure within the nozzle cap.  (Doc. 46 at 23; Doc. 48 at 10.)  Echologics disputes this

21  and argues, instead, that the claimed "enclosure" can be part of the nozzle cap, e.g., a

22  portion of the nozzle cap that encloses the transmitter.  (Doc. 48 at 9–10.)

23       The Court begins its analysis of the parties' dispute by reviewing the claim language.

24  Dependent claim 5 of the '888 Patent claims: "a transmitter disposed within an enclosure,

25  . . .  wherein the enclosure is disposed within the nozzle cap."  '888 Patent at col. 18:39-

26  41. Here, the claim language of claim 5 lists the "enclosure" as a distinct element separate

27  from the nozzle cap.  The Federal Circuit has explained "that where a claim lists elements

28  separately, the clear implication of the claim language is that those elements are distinct

components of the patented invention." *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010); *see Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*, 22 F.4th 1369, 1382 (Fed. Cir. 2022) ("The asserted claims list th[e] elements separately . . . . There is, therefore, a presumption that those components are distinct."). Thus, the claim language supports Orbis' contention that the enclosure is a distinct component separate from the nozzle cap.

Orbis' position is also supported by a review of the specification of the '888 Patent. In describing an embodiment of the invention, the specification states:

> FIGS. 6B and 6C depict cutaway views of an embodiment of the nozzle cap 600. The nozzle cap 600 has an enclosure 610 which creates a cavity into which monitoring device 110 or control device 111 may be located. The cavity is enclosed by a cover 615. The enclosure 610 and cover 615 create a water tight seal able to withstand water pressures in excess of 400 psi. . . .

> The nozzle cap 600 also includes enclosure threading 630 as a connection means for the enclosure 610 to connect to the nozzle cap 600. The enclosure 610 also includes connection threading 640 designed to mate with the enclosure threading 630.

'888 Patent at col. 6:16-34; *see id*. figs. 6b and 6c. Here, the specification, consistent with Orbis' position and the claim language, describes the enclosure as a being a distinct physical structure separate from the nozzle cap. Echologics is unable to identify any disclosure in the specification where the enclosure is described as part of the nozzle cap. Thus, the specification supports Orbis' proposed construction and not Echologics' proposal.

Echologics argues that the Court should not read limitations from a preferred embodiment described in the specification into the claims. (Doc. 43 at 12.) But that is not what the Court is doing here. By listing "enclosure" and "nozzle cap" as separate, distinct elements of the invention, the claim language itself supports Orbis' contention that the enclosure must be a separate physical structure from the nozzle cap. *See Becton, Dickinson*, 616 F.3d at 1254; *Kyocera*, 22 F.4th at 1382. The Court is merely noting that the embodiments described in the specification are consistent with this conclusion that is

derived from the claim language.  The Court is not reading limitations from specification into the claims.  The limitations are in the claim language itself.

To support its position with respect to this claim term, Echologics also relies on the prosecution history of the '888 Patent.  Specifically, Echologics relies on statements made by the examiner regarding the Zoratti prior art reference.  (Doc. 43 at 11–12.)  The Court does not find Echologics' reliance on these statements persuasive.  The Federal Circuit has cautioned that claim construction should not be decided based on "isolated statements" from an examiner.  *3M Innovative Properties*, 725 F.3d at 1332.  Here, the claim language and the specification support Orbis' contention that the enclosure is a physical structure separate from the nozzle cap.  *Cf. Phillips*, 415 F.3d at 1317 ("[B]ecause the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes.").

Finally, to support its position, Echologics also relies on a dictionary definition that defines the term "enclosure" as "something that encloses."  (Doc. 48 at 10.)  But this extrinsic evidence is unhelpful here as the parties do not dispute that the claimed "enclosure" is something that encloses.  Rather, the parties dispute is whether the thing that encloses can be part of the nozzle cap or must be a structure separate from the nozzle cap.  With respect to that dispute, the intrinsic evidence supports Orbis' proposed construction.

In sum, the Court adopts Orbis' proposed construction for this claim term.  The Court tentatively construes the term "the enclosure is disposed within the nozzle cap" as "the enclosure is a separate structure within the nozzle cap."

### III.   CONCLUSION

Accordingly, the Court hereby tentatively adopts the constructions set forth above.

/ / /

/ / /

/ / /

/ / /

21-cv-01147-RBM-AHG

1       **IT IS SO ORDERED.**

2    DATE:  June 17, 2022

3    _____

4    HON. RUTH BERMUDEZ MONTENEGRO
     UNITED STATES DISTRICT JUDGE

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

21-cv-01147-RBM-AHG